IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

MILTON MAXWELL WEST, *et al.*,        )
                                      )
        Plaintiffs,                 )
                                      )
vs.                                   )   NO. CIV-19-0004-JH
                                      )
BOARD OF COUNTY                       )
COMMISSIONERS OF THE COUNTY           )
OF CHEROKEE, *et al.*,                )
                                      )
        Defendants.                 )

## ORDER

In this case, plaintiffs Milton and Lisa West assert claims pursuant to 42 U.S.C. § 1983 for violations of their Second, Fourth, and Fourteenth Amendment rights. They also assert various state law claims. Defendants are Cherokee County, Oklahoma,[1] and defendants Grant, Bowling, Cluck and Novak, who are deputies with the Cherokee County Sheriff's office.

### Factual Background

The claims arise out of an incident on April 7, 2017. Plaintiffs' contention is that there was a trespasser on their property in rural Cherokee County and that the trespasser began shooting at Mr. West. It is undisputed that Mrs. West called 911 with a report of

---

[1] *Nominally, the defendants include the Board of County Commissioners of Cherokee County and the sheriff of Cherokee County (formerly Fisher, now Chennault) in his official capacity. Under Oklahoma law, a county is sued by naming its board of county commissioners. Girdner v. Board of Com'rs, 227 P.3d 1111, 1112 n.3 (Okla. Civ. App. 2009) (quoting 19 Okla. Stat. § 4). Further, an official capacity claim under § 1983 against the sheriff is, in substance, a claim against the county. Lopez v. LeMaster, 172 F.3d 756, 762 (10th Cir. 1999). Therefore, this order refers to claims against those defendants as claims against Cherokee County.*

gunshots outside her home, that her husband was armed and outside, and requested assistance. Deputies Grant, Bowling, Cluck and Novak were dispatched to the property.

When the deputies arrived, Mr. West was outside the West home, with a .45 caliber handgun, in the hot tub. The deputies were advised by dispatch that Mr. West had taken cover there because he was being shot at. They were also advised that Mrs. West had told her husband that the deputies had arrived and were coming up the driveway. The deputies came up the driveway with the emergency lights of their vehicles activated.

It is undisputed that shots were fired in the direction of the deputies as they came toward the house. There is a dispute, however, as to who was doing the shooting. The officers' contention is that, while none of them actually saw Mr. West shoot at them, the shots appeared to be coming from the direction of the hot tub. Mr. West contends he did not shoot at the officers, but that the trespasser did.

The deputies communicated with Mr. West via dispatch and Mrs. West, or with him directly via phone, for 15-20 minutes and eventually persuaded him to leave the hot tub and surrender. The officers then searched the area around the hot tub. They found the handgun with one round chambered and two rounds in the magazine. They located spent shell casings from the .45 on the left side of the hot tub relative to where Mr. West had been sitting. They also conducted a limited search of the surrounding area and found no evidence of a trespasser/shooter.

The deputies took Mr. West into custody based on a charge of assault and battery with a deadly weapon. After a phone discussion between the deputies and Undersheriff Chennault, they decided the best course of action would be to enter the West home and

seize any guns found there. Three of the deputies entered the house, secured a weapon that was in plain view, and then searched for and seized a number of other firearms. Defendants contend Mrs. West consented to the entry and seizure. Plaintiffs dispute that.

Mr. West was booked on the assault and battery charge and bonded out. He commenced efforts to have the sheriff's office return his firearms but was advised they could not be returned without permission from the District Attorney's office.

For reasons not clear from the current record, Mr. West was not formally charged with the assault and battery offense until January 19, 2018. In the meantime, another shooting incident occurred at the West property, on April 23, 2017. Mr. West experienced a gunshot wound to his arm, with the parties apparently disputing whether Mr. West was shot by an intruder or shot himself.

Mr. West had further contacts with the authorities via counsel and filed with the County a notice of tort claim under the Oklahoma Governmental Tort Claims Act. The criminal charges against Mr. West were eventually dismissed in July 2018. In August 2018, Mr. West obtained a court order for the return of his guns and they were returned to him in September. In early 2019, this case was filed.

## Discussion

Defendants have moved for summary judgment as to all claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A genuine dispute as to a material fact exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-

moving party." Carter v. Pathfinder Energy Servs., Inc., 662 F.3d 1134, 1141 (10th Cir. 2011) (quotations and citation omitted). When evaluating a summary judgment motion based on the defense of qualified immunity, the court must "engage in a two-pronged inquiry." Tolan v. Cotton, 572 U.S. 650, 655 (2014). Taking the facts in the light most favorable to plaintiff, the court must determine whether the defendants' conduct violated a constitutional right. Id. at 655-56. Also, the court must determine "whether the right in question was clearly established at the time of the violation." Id. at 656 (quotations and citation omitted). Finally, the Supreme Court has also emphasized in such cases "the importance of drawing inferences in favor of the nonmovant." Id. at 657.

The complaint does not clearly delineate the specific claims plaintiffs are asserting, but from the parties' submissions they appear to be as set out below.

1. **False arrest claim - § 1983**.

Mr. West contends the deputies violated his Fourth Amendment rights by arresting him without sufficient justification. He asserts a parallel claim for false arrest under state law, based on the same circumstances.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, "[i]f an officer has probable cause to believe that an individual has committed a . . . criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonable trustworthy information are sufficient to lead a prudent

person to believe that the arrestee has committed or is committing an offense." A.M. v. Holmes, 830 F.3d 1123, 1138 (10th Cir. 2016) (quotations and citations omitted). "When assessing whether an officer had probable cause to arrest an individual, courts 'examine the events leading up to the arrest, and then decide whether these historical facts viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" Id. (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotations and citation omitted)).

Here, the court concludes the undisputed facts establish that the officers had probable cause to arrest Mr. West for assault and battery with a deadly weapon. The deputies knew that Mr. West was outside his home with a firearm, situated in a hot tub. When they arrived on scene, with emergency lights activated, there were shots fired in their direction from what they thought was the vicinity of the hot tub. Mr. West refused to surrender immediately, which is consistent with him being concerned about being shot at by an intruder but also with the conclusion the officers drew — that he was reluctant to surrender after shooting at them. After detaining Mr. West, the officers located his handgun with a bullet in the chamber and two more remaining in the magazine. Spent shell casings were also found in a location that the deputies believed indicated that Mr. West had been firing in their direction.[2] The deputies also searched the area where Mr. West

---

[2] *Plaintiffs dispute whether the location of the shell casings actually proves that Mr. West shot at the officers, but they do not dispute the location of the casings relative to the hot tub and the officer's position. A reasonable officer could draw the conclusion that the location of the casings indicated shots by Mr. West at them.*

reported the unknown intruder had been but found no evidence of anyone present in, or firing a weapon from, that area.[3] None of these facts, taken individually or together, prove that Mr. West actually shot at the police officers or that he committed the crime of assault and battery with a deadly weapon. They do, however, at least establish probable cause to believe that Mr. West had committed the offense. As a result, the arrest of Mr. West was not improper under the Fourth Amendment. Defendants' motions will be granted as to the Fourth Amendment arrest claim.[4]

## 2. Wrongful search claim - § 1983.

Plaintiffs object to the search of their home, contending that the defendants entered without a warrant and without consent. It is undisputed that the officers did not have a warrant.

"With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo v. United States, 533 U.S. 27, 31 (2001) (citations omitted). "Absent consent or exigent circumstances, police may not enter a citizen's residence without a warrant." United States v. Carter, 360 F.3d

---

[3] As plaintiffs note, the fact that defendants could not locate shell casings or other evidence in a wooded area after dark has limited probative value, but it is nonetheless some evidence that Mr. West's explanation was false.

[4] Even if the court were to conclude something less than probable cause existed, it would nonetheless enter judgment for the officers as a matter of qualified immunity. An arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed. See Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012); Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)

1235, 1241 (10th Cir. 2004) (quotations and citation omitted).  Defendants contend that they entered the West residence with Mrs. West's consent.

Voluntary consent to a search has two elements: "(1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given."  United States v. Jones, 701 F.3d 1300, 1317 (10th Cir. 2012) (citing Florida v. Royer, 460 U.S. 491, 497 (1983)).  Implied consent would exist if Mrs. West "said or did something that permitted the [deputies] to form a reasonable belief that [she] was authorizing them to follow [her] into [her] residence."  *Id.* at 1321; *see, also*, United States v. Coulter, 461 Fed. Appx. 763, 766 (10th Cir. 2012) ("[A] reasonable person would have understood by Ms. Silva's action that the officer could follow her into the residence." (quotations and citation omitted)).  "In determining the voluntariness of consent, the Fourth Amendment requires that 'a consent not be coerced, by explicit or implicit means, by implied threat or covert force.'"  Jones, 701 F.3d at 1317-18 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)).

Mrs. West testified that the deputies walked into her home as she went to turn on lights at their request.  Doc. # 83-8, p. 5 ("I was busy turning on the lights and they walked in.  That's all, there was nothing to it, they just walked in.").  But her testimony is also clear that she did not object at the time to them being there — asked whether she objected or wanted them to stay out, she testified "Not … at that point."  [Doc. #83-8, at 99-100].  There is no indication the deputies coerced Mrs. West verbally or otherwise.  The court therefore concludes the undisputed facts show implied consent by Mrs. West to the

7

deputies' initial entry into the home, and there was no Fourth Amendment violation from the officers entering the home.

There is, however, a dispute of material fact as to whether Mrs. West consented to any further search after the initial entry. Her just-quoted testimony suggests that, at some point, she did object to them being there. Her testimony also suggests that her identification of the location of the other guns was not purely voluntary on her part but was in response to the officer's suggestion that he needed to know where the other guns were for officer safety. "When law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search." United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008) (quotations and citations omitted). An "objective reasonableness test is applied to measure the scope of a person's consent." *Id.* (quotations and citations omitted). The court must determine "what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances." *Id.* (quotations and citations omitted). The evidence, considered in the light most favorable to plaintiffs, supports a permissible inference that Mrs. West did not consent to the broader search of her house and that the officer's conduct exceeded the scope of what she had consented to. As a result, the court concludes there was no constitutional violation by reason of the officer's initial entry into the house. There is, however, a justiciable question as to whether their conduct exceeded the scope of what was authorized by Mrs. West's consent.

The presence of that question does not end the inquiry. The defendant deputies have also grounded their motion on the defense of qualified immunity. Qualified immunity

shields a government official "from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982). When a defendant asserts the defense of qualified immunity in a motion for summary judgment, the burden shifts to the plaintiff to establish that the defendant violated a constitutional right and that the constitutional right was clearly established. Price-Cornelison v. Brooks, 524 F.3d 1103, 1108 (10th Cir. 2008). As discussed above, plaintiffs' evidence is sufficient to create a justiciable dispute as to whether the scope of the search violated their rights. So, the question becomes whether they have shown the pertinent right to be clearly established.

In order for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on the pertinent point, or there must be clearly established weight of authority from other courts. Id. Further, the inquiry must focus on the specific facts of the particular case, as opposed to relying too broadly on general principles. Id. The Supreme Court "has repeatedly told courts not to define clearly established law at a high level of generality." City of Escondido, Cal. v. Emmons, 202 S. Ct. 500, 503 (2019) (quotations and citation omitted).

Here, at least as to the question of the scope of this particular search, plaintiffs have not attempted to identify authority which clearly establishes the pertinent violation. Confronted with a situation where they thought they had been shot at by someone living in a house, having at least the tacit consent of one resident to enter the house, having then seen one gun and learned of others, it is not obvious that the deputies' further search for

weapons was a clearly established constitutional violation. In any event, the burden to make the necessary showing is on the plaintiff, and they have not done so. Qualified immunity bars any remaining claim against the defendant deputies based on the scope of the search.

The defense of qualified immunity applies only to the defendants in their individual capacities and does not bar a claim against the County if one otherwise exists. For the county to be liable for any constitutional violation found to exist, the violation must have resulted from an "action pursuant to official policy of some nature" of the county. Monell v. Dep't of Soc. Servs. Of the City of New York, 436 U.S. 658, 691 (1978). Here, at least as to the scope of search claim, plaintiffs have not shown an arguable basis for county liability.

In sum, the initial entry into the West residence was with implied consent. To the extent that any issue exists as to the scope of the succeeding search, the defendant deputies are protected from liability by the defense of qualified immunity. No basis for county liability has been shown for any violation which occurred by reason of the scope of the search. Defendants' motions will therefore be granted as to plaintiffs' Fourth Amendment claim for unreasonable search.

3. **Wrongful seizure claim - § 1983.**

Plaintiffs contend that the seizure of their other guns (i.e. other than the one found near the hot tub) violated both their Second Amendment and Fourth Amendment rights.

With respect to plaintiffs' claims based on the Second Amendment, the court concludes no basis for claim is present here. While the full extent of the rights protected

by the Second Amendment has not been spelled out by the Supreme Court, other courts have concluded that a police officer's lawful seizure of particular firearms does not violate the Second Amendment. *See, e.g.*, Rodgers v. Knight, 781 F.3d 932, 941-42 (8th Cir. 2015) ("Lawful seizure and retention of firearms, however, does not violate the Second Amendment. Indeed, this court has held that even the *unlawful* retention of specific firearms does not violate the Second Amendment, because the seizure of one firearm does not prohibit the owner from retaining or acquiring other firearms." (citation omitted)); Meeks v. Larsen, 611 Fed. Appx. 277, 286 (6th Cir. 2015). The present circumstances do not involve a situation where some court or other governmental entity has sought to preclude plaintiffs from owning guns in general. Rather, the question here is the propriety of the seizure of the guns in the West home. That question is determined by the Fourth, rather than the Second, Amendment.

With respect to plaintiffs' Fourth Amendment seizure claim, defendants contend they are entitled to judgment on the basis that Mrs. West consented to the seizure and on the basis of a sort of "reasonable under the circumstances" standard, which they tie to an Oklahoma seizure statute. They also make passing reference to exigent circumstances.

In general, a person's property may not be seized without a warrant. Certain recognized exceptions exist to the warrant requirement. Items in plain view that may be instruments or fruits of illegal activity may be seized. United States v. Tucker, 305 F.3d 1193, 1202 (10th Cir. 2002). Exigent circumstances may also justify a warrantless seizure. United States v. Gordon, 741 F.3d 64, 69 (10th Cir. 2014).

Applying these principles here, the court concludes the seizure of the gun possessed by Mr. West while in the hot tub was proper. He was arrested for assault and battery with a dangerous weapon, and it was proper to seize the weapon thought to have been used in the offense. Washington v. Chrisman, 455 U.S. 1, 5-6 (1982). Similarly, the gun in plain sight of the officers after they entered the West residence with Mrs. West's consent was potentially a gun used in connection with the crime charged. No constitutional violation is present as to the seizure of either of those guns.

The court concludes, however, that plaintiffs' evidence is sufficient to establish a justiciable question as to whether a constitutional violation was committed when the officers seized the other guns discovered throughout the house. As noted above, there is a dispute of material fact as to the extent of what Mrs. West consented to. That dispute precludes summary judgment for defendants on the basis of consent.

Defendants reliance on an Oklahoma statute to show reasonableness of the seizure under the circumstances is also unpersuasive. Of course, an Oklahoma statute cannot legalize conduct that is otherwise unconstitutional and the general principle is that the Fourth Amendment only "permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Id.* But even aside from that, the statute itself does not appear to apply to the circumstances here. The statute, 21 Okla. Stat. § 1738(B)(6), permits the seizure and forfeiture of a "weapon possessed, used or available for use in any manner during the commission of a felony . . . or any firearm possessed by a convicted felon." 21 Okla. Stat. 1738(B)(6). By the time the deputies entered the West home, Mr. West had been arrested

and was in custody. There was no ongoing offense. There was no apparent basis for concluding the seized weapons (beyond the two referenced above) were used in the commission of the offense or were evidence of it. It appears the officers seized the weapons out of concern that Mr. West might use the weapons for some improper purpose in the future. As such, that concern potentially implicates the community caretaking exception to the warrant requirement, but defendants have not attempted to justify the seizure on that basis. See United States v. Neugin, 958 F.3d 924 (10th Cir. 2020) (discussing generally) and Caniglia v. Strom, 953 F.3d 112 (1st Cir. 2020) (discussing as to guns seized from a private residence).

In any event, the court concludes a genuine dispute of material fact exists as to whether the officers' seizure of the other guns violated plaintiffs' rights.

As with the search claim, the defendant deputies have asserted the defense of qualified immunity and the same general principles apply here. "[B]y asserting the qualified-immunity defense, [defendants] triggered a well-settled twofold burden that [plaintiffs were] compelled to shoulder." Cox v. Glanz, 800 F.3d 1231, 1245 (10th Cir. 2015). Plaintiffs must not only "rebut the [defendants'] no-constitutional-violation arguments, but [they] also [have] to demonstrate that any constitutional violation was grounded in then-extant clearly established law." Id. (citation omitted). Plaintiffs have not satisfied this burden as to the second element. Plaintiffs rely on United States v. Davis, 290 F.3d 1239 (10th Cir. 2002) for the principle that reasonable officers could not have concluded exigent circumstances existed sufficient to search plaintiffs' home in the circumstances presented. But Davis did not involve circumstances like those here, where,

13

as discussed above, the officers entered the house with the tacit consent of an occupant and discovered an additional weapon in plain view. The authorities plaintiffs cite fall short of establishing clearly established law that, in such circumstances, officers must avoid checking for other weapons. The court concludes the defendant deputies are entitled to summary judgment based on qualified immunity.[5]

The court's conclusion is different as to the seizure claim against the County. As discussed above, a county or municipality is not strictly or vicariously liable for the actions of its employees, and liability can attach only when the municipality's policy, or custom and practice, is the moving force behind the violation. Monell, supra. 436 U.S. at 691. The necessary policy or custom may be shown in various ways:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decision — and the basis for them — of subordinates to whom authority was delegated subject to these policymaker's review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).

---

[5] Deputy Novak is entitled to summary judgment on the seizure claim for a more fundamental reason. It is undisputed that he was not in the house and did not participate in the seizure.

To the extent that plaintiffs asserts County liability based on failure to train or supervise, the County's motion will be granted. Plaintiffs' conclusory arguments as to the County defendants' failure to train does not raise a genuine dispute of material fact in the face of defendants' evidence regarding the training the deputies received. Likewise, plaintiffs have failed to present evidence which, viewed in the light most favorable to them, shows the County was deliberately indifferent to a substantial risk of the violation of constitutional rights due to the supervision of deputies or the development of policies. That supervision and policy development may have come more from Chennault than from Fisher, but the evidence does not support an inference that policy and supervision were so lacking as to be a basis for county liability.

The evidence does, though, indicate that Undersheriff Chennault authorized the decision to seize the "other" weapons. In Oklahoma, the county sheriff is generally viewed as the final policymaker for the sheriff's office, but there is evidence here from which a jury could conclude that then-Sheriff Fisher delegated policymaking in this area to Chennault and that he ratified those policies. Fisher delegated authority to draft department policies and procedures to then-Undersheriff Chennault. Doc. # 107-3, p. 3. Chennault was also generally responsible for the training deputies regarding department policies and procedures. *Id.* at 5. And Chennault testified that the deputies acted reasonably in searching the West residence and seizing the firearms collection, even though there was no pressing need for deputies to enter the home that evening because Mr. West had been arrested. *Id.* at 4, 9. He believed that actions were reasonable to "avoid a future crime." *Id.* at 10.

The court concludes that a question of fact remains as to whether a Cherokee County policy, custom, or practice exists which led to the potential Fourth Amendment seizure violation addressed above. There is evidence that the deputies executed the seizure based on policy ratified by the County policymaker. As a result, the County is potentially liable for any seizure violation ultimately established by plaintiffs. The motion of the County will be denied as to the seizure claim.

4. **Fourteenth Amendment Due Process Claim.**

Plaintiffs allege that defendants violated their Fourteenth Amendment due process rights by seizing and failing to return their firearms in a reasonable manner. With respect to the Due Process claims against the individual deputies, summary judgment will be granted in the deputies' favor. Plaintiffs have presented no evidence which supports an inference that the non-return of the guns was due to the deputy's actions. Plaintiffs' efforts appear to have been directed to the Sheriff's and District Attorney's offices.

The same result follows as to the Due Process claim against the County, although for different reasons. Intentional deprivation of property may violate an individual's Fourteenth Amendment procedural due process rights, if that individual is denied a meaningful post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517, 531 (1984). The Supreme Court has concluded that post-deprivation state-law remedies are generally sufficient to satisfy the demands of due process." City of West Covina v. Perkins, 525 U.S. 234, 241 (1999). Here, plaintiffs sought and eventually received a state court order for the return of the firearms. The court concludes this was sufficient to satisfy the demands of due process. Plaintiffs object that they were forced to hire an attorney and obtain a court

order for the return of the firearm collection, but that alone is not a basis for concluding they had no meaningful remedy. Pursuant to Oklahoma's forfeiture statute, notice of seizure and intended forfeiture of property must be provided to all owners and parties in interest who may then challenge the seizure and forfeiture in court. 21 Okla. Stat. § 1738. Plaintiffs have not alleged or presented any evidence that they were required to do anything other than follow state-law remedies for the recovery of their property. Accordingly, defendants are entitled to summary judgment on the Due Process claim.

## 5. State law claims.

Plaintiffs' complaint appears to plausibly allege four claims against defendants arising under state law: false arrest, defamation/false light invasion of privacy, and for violations of plaintiffs' rights under the Oklahoma Constitution to be free from unreasonable searches and seizures (Art. II, Sec. 30) and to keep and bear arms. (Art. II, Sec. 26).[6]

With respect to the false arrest claim, the elements of the state law claim substantially parallel those applicable to the federal false arrest claim discussed above. Delong v. State, 956 P.2d 937, 938-39 (Okla. Civ. App. 1998). In particular, the existence of probable cause is a "complete defense" to liability. Roberts v. Goodner's Wholesale Foods Inc., 50 P.3d 1148, 1152 (Okla. Civ. App. 2002) (citing Lewis v. Crystal Gas Co.,

---

[6] *It is not clear from the cursory reference in the complaint that plaintiffs are even asserting § 1983 claims based on negligent hiring, training, or supervision. However, to the extent they are, they have failed to present evidence sufficient to create a material fact issue.*

532 P.2d 431, 433 (Okla. 1975). As noted above as to the parallel federal claim, the undisputed facts establish that the officers had probable cause to arrest Mr. West.

As to the defamation/false light claim, defendants contend the notice of tort claim given by plaintiffs to the County pursuant to the OGTCA made no mention of such a claim. Under the OGTCA, notice is a "mandatory prerequisite jurisdictional requirement to filing a claim for tort damages." Hall v. GEO Group, Inc., 324 P.3d 399, 400 (Okla. 2014) (citations omitted). Plaintiffs counter that they are not required to articulate particular theories of recovery in their notice, and that appears true, but the notice in question [Doc. No. 83-26] did not even mention circumstances that might arguably be the basis for such a claim. There is zero suggestion in the notice that any relief was sought beyond recovery for the arrest, search and seizure claims. The court concludes the undisputed facts show plaintiffs to have failed to comply with the necessary preconditions to recovery set out in the OGTCA.[7]

As to the state constitutional claim based on Art. II, Sec. 26, the right to keep and bear arms, the court has considerable doubt whether the Oklahoma courts would recognize a private right of action as to that section (as opposed to its use as a defense to some state-sponsored effort to restrict generally a person's right to bear arms). The remedy recognized in Bosh v. Cherokee Co. Bldg. Auth., 305 P.3d 994 (Okla. 2013) involved a claim of excess force. While the Oklahoma Supreme Court appears not to have squarely addressed the

---

[7] *The court also notes that plaintiffs have failed to present evidence that any defendant published any false or defamatory statements or any statements that placed plaintiffs in a false light.*

issue, this and other courts have concluded that Bosh (even without the further limitations now existing due to Barrios) was substantially limited to the excess force situation and did not have the effect of creating a private right of action for every arguable violation of the Oklahoma Constitution. Earles v. Cleveland, 418 F.Supp.3d 879, 890-91 (W.D. Okla. 2019); Stuart v. City of Custer City, No. CIV-18-471, 2018 WL 5260047, at *5 (W.D. Okla. Oct. 22, 2018). Further, it did not recognize, even as to claims clearly within its rationale, claims against individual employees, as opposed to the governmental entity itself. *See* Maher v. Oklahoma, 165 F.Supp.3d 1089, 1093 n.3 (W.D. Okla. 2016).

In sum, the court concludes the Oklahoma courts, when confronted with the issue, are likely to apply Art. II, Sec. 26, in a way parallel to that of the federal Second Amendment, and with the same result as discussed above. Summary judgment for defendants will therefore be granted as to the Art. II, Sec. 26 claim.

The legal status of plaintiffs' constitutional claim under Okla. Const. Art. II, Sec. 30, relating to unreasonable searches and seizures, is less clear. It may be that the Oklahoma courts will recognize a private right of action for violation of this section, akin to the federal Bivens remedy. *See* Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1167 (Okla. 2009) ("[L]iability exists for acts that can be described as abuses of lawful power by officers."). However, rather than attempting that analysis in the absence of more complete briefing from the parties, and as plaintiffs' OGTCA notice arguably embraced the arrest and seizure claims, the court concludes for present purposes that defendants are not entitled to summary judgment on state search and seizure claims under the Oklahoma

Constitution. It does, however, conclude that the reach of those claims is limited to the same extent as the parallel federal claims discussed above.

Conclusion

For the reasons stated, the motion for summary judgment of the defendant deputies [Doc. # 84] is **GRANTED**. The motion for summary judgment of Cherokee County [Doc. # 83] is **GRANTED** in part and **DENIED** in part. The motion is **DENIED** as to the Fourth Amendment claim for unlawful seizure of the firearm collection and the parallel state constitutional claim; the motion is **GRANTED** as to all other claims. Defendants' motion to stay [Doc. #118] is **STRICKEN as MOOT**. Further, in light of the docket uncertainties resulting from the COVID-19 pandemic and the anticipated transfer of this case to another judge of the court, the current scheduling order [Doc. # 93] is **STRICKEN.**

**IT IS SO ORDERED**.

Dated this 18th day of June, 2020.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE